RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0223p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

GENEVA FRANCE; LOWESTCO BALLARD,

*Plaintiffs-Appellants,*

*v.*

LEE LUCAS, et al.,

*Defendants,*

No. 15-3593

CHARLES METCALF; MATT MAYER; LARRY FAITH; J. STEVE SHELDON; RICHLAND COUNTY, OHIO; ESTATE OF JERRELL BRAY,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:07-cv-03519—Donald C. Nugent, District Judge.

Argued: April 28, 2016

Decided and Filed: September 7, 2016

Before: NORRIS, McKEAGUE, and WHITE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Charles A. Koenig, KOENIG & LONG, LLC, Columbus, Ohio, for Appellants. Daniel T. Downey, FISHEL HASS KIM ALBRECHT LLP, Columbus, Ohio, for Appellees Faith, Mayer, Sheldon, and Richland County. Michael M. Heimlich, Delaware, Ohio, for Appellee Metcalf. **ON BRIEF:** Charles A. Koenig, Todd A. Long, KOENIG & LONG, LLC, Columbus, Ohio, for Appellants. Daniel T. Downey, Paul M. Bernhart, FISHEL HASS KIM ALBRECHT LLP, Columbus, Ohio, for Appellees Faith, Mayer, Sheldon, and Richland County. Michael M. Heimlich, Delaware, Ohio, for Appellee Metcalf.

McKEAGUE, J., delivered the opinion of the court in which NORRIS, J., joined, and WHITE, J., joined in part. WHITE, J. (pp. 27–42), delivered a separate opinion concurring in part and dissenting in part.

1

---

**OPINION**

---

McKEAGUE, Circuit Judge.  Plaintiffs-appellants Lowestco Ballard and Geneva France were framed during Operation Turnaround, a corrupt investigation into the Mansfield, Ohio drug trade by the United States Drug Enforcement Agency (DEA) and the Richland County Sheriff's Office (RCSO).  The federal government prosecuted Ballard and France for allegedly selling drugs to law-enforcement officials and confidential informant Jerrell Bray.  After Operation Turnaround ended, however, Bray admitted that he used his friends to act as "stand-ins" for the drug buys and intentionally misidentified them to frame Ballard and France.  Ballard and France then sued Bray, DEA Special Agent Lee Lucas, and the defendants-appellees, RCSO officers Charles Metcalf, Matthew Mayer, Larry Faith, and Steven Sheldon, as well as the County of Richland, under 42 U.S.C. § 1983 for numerous claims, including malicious prosecution and fabrication of evidence.

The district court granted summary judgment to the defendants.  Ballard and France appeal that decision, arguing that we should infer from the evidence that the RCSO officers knew Bray was using stand-ins to frame them and at times even assisted him in doing so.  But Ballard and France have failed to produce evidence showing that the officers *personally* violated their constitutional rights.  In addition, the officers relied on eyewitness identifications of Ballard and France by Special Agent Lucas and indictments from a federal grand jury for probable cause, and Ballard and France have failed to show a genuine issue of material fact as to whether the defendants should have doubted that there was probable cause.  For the reasons set forth below, we **AFFIRM** the district court.

**I.  Background**

**A.     Operation Turnaround**

Lowestco Ballard and Geneva France were separately arrested and charged as part of "Operation Turnaround," an investigation into the Mansfield, Ohio drug trade launched by the Richland County Sheriff's Office and later joined by the DEA.  This case one in a series of

lawsuits brought by individuals who were targeted during Operation Turnaround. *See Webb v. United States*, 789 F.3d 647, 652 (6th Cir. 2015); *Robertson v. Lucas*, 753 F.3d 606, 610 (6th Cir. 2014).[1] *Webb* is particularly relevant because it involved the same controlled buy that led to the prosecution of Geneva France.

RCSO launched Operation Turnaround after the death of Timothy Harris in December 2004, believing Harris's death to be drug related. As part of the investigation, RCSO recruited Jerrell Bray as a confidential informant to make controlled buys from suspected drug traffickers in Richland County.

In August 2005, the DEA joined Operation Turnaround and DEA Special Agents, including Special Agent Lee Lucas, registered Bray as a DEA informant. Bray had previously made several buys for RCSO, and he had also supplied Lucas with reliable information in a separate DEA drug investigation in Cleveland, Ohio. Controlled buys proceeded as follows:

> Bray and the RCSO officers would identify a target and inform the DEA agents, who would supply the buy money and travel from Cleveland to assist. Bray would place a phone call to the target. Investigators would search Bray and his vehicle before the buy and follow Bray to the location of the buy, attempting to view or record the transaction when possible. After the buy, they would follow Bray back to the sheriff's office, search Bray's person and vehicle, and take a statement from Bray.

*Webb*, 789 F.3d at 652 (quoting *Mott*, 524 F. App'x at 181).

Bray worked with several RCSO officers, including Detective Charles Metcalf; his supervisor, Sergeant Matthew Mayer; and their supervisor, the head of the detective bureau, Captain Larry Faith. Faith was supervised by non-defendant Major Reeves, who was supervised by Sheriff Steve Sheldon. As a result of Bray's controlled buys, law enforcement arrested and prosecuted over two dozen individuals, including Ballard and France.

---

[1]*See also Brown v. United States*, 545 F. App'x 435 (6th Cir. 2013); *Mott v. Mayer*, 524 F. App'x 179 (6th Cir. 2013); *Lee v. Lucas*, No. 1:10CV00151, 2013 WL 5670930 (N.D. Ohio Oct. 15, 2013); *Williams v. Lucas*, No. 1:10CV615, 2011 WL 4632883 (N.D. Ohio Sept. 30, 2011); *Westerfield v. Lucas*, No. 1:07CV3518, 2011 WL 1831676 (N.D. Ohio May 12, 2011).

**B.      Facts Specific to Lowestco Ballard**

*Controlled Buy.*  The controlled buy that led to the arrest and prosecution of Lowestco Ballard took place on September 9, 2005, at Eastgate Apartments.  Ballard asserts that Bray purchased crack from Darren Transou (a stand-in), but intentionally misidentified him as Ballard.

According to DEA Special Agent Lucas's official report, Bray met with Lucas and Detective Metcalf and made a number of calls to Ballard to set up the deal.  Bray's phone records show that he never called the number listed in Lucas's report.  Bray instead called Transou, who needed directions to Eastgate Apartments and at one point referred to "West" (for "Lowestco Ballard") in the third person.  Detective Metcalf monitored these calls.  Sergeant Mayer accompanied Special Agent Lucas in a pick-up truck and provided video surveillance while Bray purchased drugs from Transou.

Transou drove a green Ford Bronco to the September 9 drug buy used to frame Ballard.  This is relevant because two days before the buy, on September 7, a state trooper had stopped Transou while he was driving a green Bronco to Detroit to buy drugs.  Bray and law enforcement set up this September 7 stop to target Noel Mott and Arrico Spires.  Bray had told law enforcement he was following Mott and Spires in a separate vehicle, while Sergeant Mayer was following Bray.  Yet when the state trooper stopped the Bronco, he found Transou and Crystal Dillard, rather than Mott and Spires, inside it.  The trooper called Metcalf, who was at the police station monitoring the GPS, to tell him Transou was in the green Bronco.  The trooper then let Transou go.  Ballard points to the September 7 incident as evidence that the green Bronco was a tip-off to officers that Transou, not Ballard, was taking part in the September 9 controlled buy.

*Ballard's Prosecution.*  Special Agent Lucas testified before a federal grand jury that Ballard sold drugs to Bray on September 9.  Ballard was indicted on criminal drug charges and arrested pursuant to a warrant from a United States Magistrate Judge.  At trial, Special Agent Lucas was shown Transou's picture but testified that it was Ballard—not Transou—who sold Bray drugs on September 9.  The jury acquitted Ballard and he was released after spending almost a year in pretrial detention.

## C.    Facts Specific to Geneva France

*Controlled Buy.*    The controlled buy that led to Geneva France's arrest took place on October 25, 2005, and is also detailed in our opinion in *Webb*, 789 F.3d at 654–56.  France was not the initial target of this buy, as Bray had told law-enforcement officers he could set up a buy with "Ronald Davis."  "Ronald Davis" was an alias used by Herman Price, who had paid his brother-in-law, the actual Ronald Davis, to use Davis's name, birth certificate, and Social Security card.  *See Webb*, 789 F.3d at 654–55.

Special Agent Lucas and Detective Metcalf recorded and monitored two telephone calls Bray made to Price to set up the controlled buy.  At France's trial, Lucas testified that he "dialed the numbers."  According to Lucas's DEA report, at 2:05 p.m. Bray made the first call and spoke to a woman known as "Lil S" to discuss purchasing crack cocaine.  During the call, Bray and "Lil S" made plans to meet at 121 Glessner Avenue.  In truth, Bray called his girlfriend's cell phone and spoke with his girlfriend, who said she would send "her girl."  Lucas's report then noted that Bray made a second call to Price (posing as Ronald Davis) to discuss purchasing crack cocaine, and the two planned to meet at 187 South Adams Street.  The audio recording reveals that Bray and Price never discussed a drug purchase.

After these calls, Faith and Metcalf drove to Price's home at 121 Glessner Avenue.  According to Lucas's report and an affidavit Faith would submit for a search warrant of Price's home, Metcalf and Faith observed Price leave his home and followed him to 187 South Adams Street.  Faith would later admit that he and Metcalf never followed Price to South Adams Street.  In the meantime, Lucas and Bray drove to 187 South Adams Street for Bray to meet Price.  Inside the house, Bray asked to buy drugs from Price.  Price responded "I definitely can get it" and told Bray that he would call him with a price for the drugs.

After returning to the vehicle, Bray told Lucas they needed to go back to Glessner Avenue to buy drugs from "Price's girl."  Lucas agreed, even though the audio recording shows that Bray and Price never made any agreement for Bray to buy drugs from "Price's girl."

At approximately 2:20 p.m., Bray and Lucas picked up Karmiya "Shea Shea" Moxley, whom Bray would falsely identify as Geneva France.  Moxley identified herself as "Lil S," the

woman Bray had supposedly spoken to earlier to set up the buy. Bray told Moxley that Price had asked him to pay her for the drugs. Lucas, who bought the drugs from Moxley, claimed that they were "a little light," so he asked Bray to call Price and ask him to lower the sales price. Lucas testified at France's criminal trial that he heard Price on the other line, even though phone records show no calls from Bray's phone to Price's number during the buy. Bray later admitted he pretended to dial the phone and had a fake conversation with Price. Faith and Metcalf remained in the field providing surveillance during the buy. They would not have been able to hear whether Bray was actually on the phone with Price.

*Prosecution.* Metcalf first linked "Lil S" to a woman named Shakkia Gordon. He obtained a photo of Gordon, but Special Agent Lucas denied that Gordon was the woman who sold him drugs. Metcalf then linked "Lil S" to Geneva France after Bray told him that the suspect's first name was "Geneva." Law enforcement was unable to find a driver's license photo of France, but Sergeant Mayer located a sixth grade school photo of France and provided it to Metcalf. Lucas and Bray separately identified the woman in the photo as "Lil S." Mayer admitted, however, that no one put the photo in a photo array for proper identification, and the photo may have been captioned "Geneva France" when shown to Bray.

Special Agent Lucas testified before a federal grand jury that Geneva France sold him drugs in a controlled buy from Price. *Webb*, 789 F.3d at 656. France and Price were indicted and charged with distribution of 50 grams or more of crack cocaine distributed within 1,000 feet of school grounds. A magistrate judge then issued a warrant for France's arrest based on the indictment.

Lucas, Metcalf, and Bray testified against France at trial, and Lucas again identified France as the woman who sold him drugs during the controlled buy. Metcalf testified that he and Faith were about 150 yards away from the vehicle where the buy took place. He testified that he saw an African-American woman enter the vehicle, but that she was too far away to identify. The jury found France guilty on both counts, and she was sentenced to the mandatory minimum of ten years' imprisonment.

**D.     Operation Turnaround Falls Apart**

The issues with Operation Turnaround went well beyond Ballard's and France's investigations:

> For example, a stand-in was used to frame . . . Dwayne Nabors.  Metcalf has admitted that he lied during Nabors's criminal trial, including admitting to a false identification of Nabors.  Ansari also falsely identified Nabors in the alleged drug transaction.  Lucas and Metcalf lied to the prosecutor about whether there was video taken of the transaction, although Metcalf himself had operated the video camera.
>
> Bray used the controlled buys to steal money and drugs.  [Law-enforcement officers] were aware of this fact yet continued to use Bray as an informant.  On one occasion, [DEA Task Force Agents] Verhiley and Ansari caught Bray stealing money given to him for a drug buy.  On another occasion, Bray accepted a Buick Cutlass (a car) in lieu of some of the money that was supposed to be paid as part of the drug deal.  In effect, Bray was shorting the government the value of the car.  Bray, however, was caught on [a] recording discussing the "Cutty."  When Bray was questioned about the conversation, he claimed it was a comment about a "Caddy" (Cadillac) that he had been interested in purchasing, but Lucas stepped in on Bray's behalf and asserted that "Cutty" was another term for drugs.
>
> Efforts to corroborate Bray's information were stymied by Bray, and law enforcement disregarded accepted protocol.  For example, the first step in a controlled buy was typically a controlled phone call to the target.  Appellants produced evidence indicating that Bray dialed identical telephone numbers for unrelated suspects and lied about which suspects he was calling and that the official reports did not accurately reflect the phone conversations Bray had.  Bray at times turned off his wireless transmitter during buys.  Metcalf also admitted that "the manner in which the Webb deal was conducted violated DEA procedures" and "was not the way that a standard deal should go."

*Webb*, 789 F.3d at 652–53 (quoting *Robertson*, 753 F.3d at 612).

In 2007, Operation Turnaround fell apart.  Bray, in prison for an unrelated homicide, disclosed that he had framed targets of Operation Turnaround by using stand-ins to stage drug transactions or by passing off his own drugs as having been purchased from targets under investigation.  *Robertson*, 753 F.3d at 611.  "Bray claimed that he initially . . . told authorities that [DEA Special Agent] Lucas and [DEA Task Force Agent] Ansari were complicit in his

actions, specifically those involving Geneva France and Joshawa Webb." *Id.* at 613. Based on the evidence, he did *not* implicate any of the RCSO officers.

Bray pleaded guilty to two counts of perjury and five counts of deprivation of civil rights. His plea agreement indicated he falsely identified "Lil S" as Geneva France, and that he committed perjury at France's trial. The government moved to vacate France's conviction and sentence and dismissed the indictment against her. She spent sixteen months in federal prison. Bray's plea agreement did not mention Ballard, who had already been acquitted.

In 2009, Metcalf pleaded guilty to falsifying evidence against Dwayne Nabors. Nabors was a plaintiff in this case, but the district court granted summary judgment on his claims to all defendants save Metcalf, and Metcalf and Nabors settled Nabors's remaining claims.

The federal government indicted Special Agent Lucas for obstruction of justice, making false statements, perjury, and deprivation of civil rights for his role in Operation Turnaround. *Robertson*, 753 F.3d at 612–13. Bray testified as a witness for the government at Lucas's criminal trial. While Bray admitted to fabricating evidence against Ballard and France, he stated that no law-enforcement officials, including Lucas, were involved in or aware of his deception. A jury found Lucas not guilty. *Robertson*, 753 F.3d at 613.

According to our decision in *Webb*, the Office of the Inspector General (OIG) of the United States Department of Justice completed an independent investigation on Operation Turnaround. 789 F.3d at 653. "Despite the [not guilty] verdict, a 2011 OIG investigation concluded that Lucas falsified reports and testimony to corroborate Bray's false identifications." *Id.* The OIG report is, however, conspicuously absent from our record in this case.

**E.     Procedural Background**

Ballard, France, and three other individuals targeted in Operation Turnaround filed suit against Bray, DEA Special Agent Lucas, Richland County, and other federal and state law-enforcement officers under 42 U.S.C. § 1983 for civil rights violations. They settled or dismissed their claims against most defendants, including Special Agent Lucas. Bray died in prison in September 2012. *Webb*, 789 F.3d at 653 n.1. Thus, at the summary judgment stage,

the only remaining defendants were Richland County and RCSO officers Metcalf, Mayer, Faith, and Sheldon.

The plaintiffs asserted § 1983 claims for false arrest, malicious prosecution, fabrication of evidence, violations of *Brady v. Maryland*, 373 U.S. 83 (1963), municipal liability under *Monell v. Department of Social Services of N.Y.C.*, 436 U.S. 658 (1978), and conspiracy, as well as a separate conspiracy claim under 42 U.S.C. § 1985.  On January 4, 2012, the district court granted summary judgment in full to Mayer, Faith, and Sheldon, and in part to Metcalf.  Following additional discovery, Metcalf and Richland County moved for summary judgment.  In opposing these summary judgment motions, the plaintiffs submitted an affidavit in August 2012 from Bray to support their allegations that RCSO officers knew Bray was framing the targets of Operation Turnaround.  Bray died in prison the next month.  *Webb*, 789 F.3d at 653 n.1.  The district court disregarded Bray's affidavit under the "sham affidavit" doctrine and granted summary judgment in full to Metcalf and Richland County.  *France v. Lucas*, No. 1:07CV3519, 2012 WL 5207555, at *1 (N.D. Ohio Oct. 22, 2012).  Ballard and France appealed.

## II.  Analysis

Ballard and France raise a host of issues on appeal.  First, they contest the district court's decision to apply the "sham affidavit" doctrine to disregard Bray's affidavit.  Second, they appeal the district court's decision to grant summary judgment on their § 1983 claims against Metcalf, Mayer, Faith, Sheldon, and Richland County for: (1) malicious prosecution; (2) fabrication of evidence; (3) violations of France's rights under *Brady*; and (4) municipal liability under *Monell*.  Third, they appeal the district court's decision to deny their motions for additional discovery.  Finally, they appeal the district court's decision to deny their motion to supplement the record with an expert witness's affidavit.[2]

### A.    Bray's Affidavit

We begin with Bray's affidavit, which, if admissible, would create issues of fact for many of plaintiffs' claims.  Bray's affidavit is devoted to asserting that Metcalf, Mayer, Faith,

---

[2]The plaintiffs purport to appeal the district court's denial of their motion to file a second amended complaint, Appellants Br. at 8, but they do not raise the argument in their briefs and have therefore forfeited it.

and Lucas were aware Bray was framing people and assisted him in fabricating evidence. It includes specific statements that Metcalf and Mayer knew Bray was framing Ballard and France. The district court declined to consider the affidavit by applying the "sham affidavit" doctrine. *France*, 2012 WL 5207555, at *3–7. We review that decision for an abuse of discretion. *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006).

Under the sham affidavit doctrine, after a motion for summary judgment has been made, a party may not file an affidavit that contradicts his earlier sworn testimony. *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). If the affidavit directly contradicts prior sworn testimony, it should be stricken "unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Aerel*, 448 F.3d at 908. If the affidavit does not directly contradict prior sworn testimony, it should be stricken if it is "an attempt to create a sham fact issue." *Id.* at 908–09 (citation omitted). The rationale behind the doctrine, which is applied in some form in nearly every circuit, is simple: "[i]f a party who has been examined at length [under oath] could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969); *see Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 252 (3d Cir. 2007) (collecting cases).

Bray's affidavit marks the *third* different version of his story on Operation Turnaround. When Bray first confessed to framing individuals, he implicated Lucas and DEA Agent Ansari as participants in framing Operation Turnaround targets. There is no evidence that he implicated Metcalf, Mayer, or Faith in his initial story. Then, at Lucas's criminal trial, Bray told his second version of events and testified that *no* law-enforcement officers worked with him to fabricate evidence:

> Q. And you indicated—today I believe you're indicating that the stand-in situation was done *by you and you alone*, correct?
>
> A. Yes, sir, it was.
>
> Q. Okay. But initially, when you met with the government, you told them that Lucas was involved in each and every stand-in situation, isn't that true?

A. Yes. Yes, sir.

Q. Why would you do that, sir?

A. Again I was trying to get myself out of trouble, so I was lying, sir.

\*\*\*\*

Q. Did you make any false allegations against any of the Richland County people?

A. I don't recall.

Q. Didn't you make false allegations against Mr. Metcalf?

A. I don't recall.

Q. All right.

A. I was lying at the time so I don't recall.

App'x at 1221, 1224–26, Bray Testimony at Lucas Trial, R. 120. Bray was a defendant in this lawsuit when plaintiffs filed his affidavit, and the affidavit directly contradicts his prior sworn testimony that no law-enforcement officials were involved in framing the targets of Operation Turnaround. On its face, then, the sham affidavit doctrine appears applicable.

The wrinkle here, however, is that we generally apply the sham affidavit doctrine against a party who attempts to avoid summary judgment by filing *his own* affidavit that directly contradicts *his own* prior sworn testimony. *See, e.g., Jones v. General Motors Corp.*, 939 F.2d 380, 385 (6th Cir. 1991) ("[I]t is well settled that *a plaintiff* may not create a factual issue for the purpose of defeating a motion for summary judgment by filing an affidavit contradicting a statement *the plaintiff* made in a prior deposition.") (emphasis added). Ballard and France argue that we should consider Bray's affidavit because *they* made no contradictory statements to avoid summary judgment. Rather, they submitted an affidavit from Bray—an opposing party, no less—and therefore the sham affidavit doctrine should not bar its use.

We have yet to confront this unique factual scenario: an affidavit from one defendant, which directly contradicts his prior sworn testimony, submitted by the *plaintiffs* to defeat summary judgment motions from *other defendants*. The plaintiffs are correct that *Reid*, which

was the genesis of the sham affidavit doctrine in our circuit, involved a plaintiff filing an affidavit that directly contradicted her prior deposition testimony. 790 F.2d at 459–60. But they point to no case limiting the doctrine to *Reid*'s circumstances.

Beyond our own precedent, the Third Circuit has applied the sham affidavit doctrine in circumstances that resemble this case. *See Jiminez.*, 503 F.3d 247. In *Jiminez*, a man died of asphyxia outside a bar after two of the bar's employees forced him to the ground and held him down. *Id.* at 248–49. The man's estate sued the bar and also brought a *Monell* claim against the local police department, alleging the police had a policy of directing the bar's employees to detain persons they believed violated the law. *Id.* at 250. The bar owner testified at his deposition that he did not consult with the police department regarding the bar's detention policy and that no police official offered training or direction to the bar's employees. *Id.* at 250–51. He later submitted a contradictory affidavit stating that the police asked bar employees on several occasions to assist in apprehending individuals. *Id.* at 250.

The Third Circuit affirmed the district court's decision to strike the affidavit under the sham affidavit doctrine. *Id.* at 254–55. The district court noted "that [the bar owner]'s interests were directly adverse to those of the [police department] for purposes of the [police department]'s motion for summary judgment, as resolution in favor of the [police] would only expose the [bar] to greater potential liability." *Id.* at 255. It also observed that the bar owner "offered no explanation for the conflict" between his sworn deposition testimony and his affidavit. *Id.* The Third Circuit affirmed this reasoning, explaining that "[a] sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment." *Id.* at 253.

Bray, just like the bar owner in *Jiminez*, signed a contradictory affidavit implicating his codefendants. Bray's affidavit, just like the bar owner's, was submitted for the sole purpose of defeating his codefendants' motions for summary judgment. And Bray's interests, while perhaps not directly adverse to his codefendants', were certainly not aligned with them.

We find the rationale underlying the sham affidavit doctrine and the reasoning in *Jiminez* to be persuasive. First, Bray's affidavit directly contradicts his sworn testimony at Lucas's trial

in 2011. It is also inconsistent with his 2007 statements to authorities—so even when Bray *was* accusing law-enforcement officials of framing targets, he *still* did not implicate Metcalf, Mayer, or Faith. Second, while we need not pass on the admissibility of Bray's affidavit at trial, Bray died within weeks of submitting the affidavit, meaning the defendants would have no opportunity to cross-examine him or test which version of his story is true. Third, the existence of a sham fact issue turns on factors such as "whether the affiant was cross-examined during his earlier testimony" (Bray was) and "whether the affiant had access to the pertinent evidence at the time of his earlier testimony" (Bray did). *Aerel*, 448 F.3d at 909 (citation omitted).

Finally, the plaintiffs have utterly failed to provide any explanation for the conflict between Bray's affidavit and his previous testimony at Lucas's trial. The affidavit is designed to combat the district court's conclusion that the defendants did not personally violate Ballard's and France's constitutional rights.[3] The affidavit's timing is even more suspicious: while the district court granted summary judgment to Mayer, Faith, Sheldon, and Metcalf (in part) in January 2012, the plaintiffs did not submit Bray's affidavit until August 2012—more than seven months later, and almost *four years* after they first opposed summary judgment.

At oral argument, the plaintiffs argued that we should admit the affidavit because Bray finally decided to "come clean." They also suggest in their briefs that we should consider the affidavit because it was "damning" to Bray's case. These arguments fail to account for the questionable circumstances surrounding the affidavit. Bray "came clean" when he admitted to authorities in 2007 that he framed Ballard, France, and other targets of Operation Turnaround. He admitted to framing them again in 2011 at Lucas's trial, where he also "came clean" by admitting he lied about the involvement of Special Agent Lucas and other law-enforcement officers. The only consistent part of Bray's ever-changing story is that *he* was framing people. As Bray already admitted this—twice—the affidavit is not damning to him in the least bit.

---

[3]While we do not weigh the evidence in the affidavit, we do note than many of the allegations in the affidavit are unsupported by the record. For example, the affidavit alleges that Mayer videotaped the drug buy used to frame Geneva France. Yet there is no evidence—not in our record, not from our previous decision in *Webb* involving the same buy, not from France's trial, not from Lucas's trial, and not from any of Bray's previous versions of events—that a video of that drug buy even exists.

The sham affidavit doctrine "invariably reflect[s] the importance of distinguishing legitimate efforts to supplement the summary judgment record from attempts to create a sham issue of material fact." *Id.* at 908. We have a contradictory affidavit, recounting the affiant's *third* version of events, submitted not only years after the defendants moved for and the plaintiffs opposed summary judgment, but submitted months after the district court ruled on the summary judgment motions. In these circumstances, we hold that the district court did not abuse its discretion by disregarding Bray's affidavit.

**B.     42 U.S.C. § 1983 Claims**

We review the district court's decision to grant summary judgment *de novo*. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We must view the evidence and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The inquiry is whether a reasonable jury could return a verdict for the nonmoving party or "whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

To prevail on claims under 42 U.S.C. § 1983, a plaintiff must prove that he or she was deprived of a right secured by the Constitution or laws of the United States and that the deprivation was caused by a person acting under color of state law. *Webb*, 789 F.3d at 659. It is undisputed that the defendants acted under color of state law, so the issue is whether the defendants deprived the plaintiffs of their rights. *See Robertson*, 753 F.3d at 614.

Qualified immunity is an affirmative defense to § 1983 claims. *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010). To determine whether an officer is entitled to qualified immunity, we apply a two-prong test: (1) whether "the facts alleged show the officer's conduct violated a constitutional right" and (2) whether that right was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). We have discretion to address either prong first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Once defendants raise the defense of qualified immunity,

"the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Binay*, 601 F.3d at 647 (internal quotation marks omitted).

Ballard and France appeal the district court's decision to grant summary judgment to Metcalf, Mayer, Faith, and Sheldon on § 1983 claims for (1) malicious prosecution; (2) fabrication of evidence; (3) *Brady* violations as to France; and (4) *Monell* claims against Richland County. We address each in turn.

### 1.      Sheriff Steve Sheldon

Before turning to the plaintiffs' specific claims, however, we address plaintiffs' claims against Sheriff Sheldon. "[T]o overcome a qualified immunity defense, an individual must show that his or her *own* rights were violated, and that the violation was committed *personally* by the defendant." *Robertson*, 753 F.3d at 615. There is no evidence in the record that Sheldon personally violated plaintiffs' rights. We therefore affirm summary judgment in his favor.

### 2.      Malicious Prosecution

The Fourth Amendment guarantees freedom from malicious prosecution. *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). To succeed on a malicious prosecution claim, a plaintiff must prove: (1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor. *Id.* at 308–09. There is no dispute that Ballard and France were deprived of their liberty and that criminal proceedings were ultimately resolved in their favor, so we address only the first two elements.

*Participation.* Ballard and France must provide evidence that each defendant personally violated their rights. For malicious prosecution, "the term 'participated' should be construed within the context of tort causation principles. Its meaning is akin to 'aided.' To be liable for 'participating' in the decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating." *Id.* at 308 n.5.

*Probable Cause.* A malicious prosecution claim under § 1983 fails "when there was probable cause to prosecute." *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 365 (6th Cir. 2013) (citation omitted). Probable cause exists when the "'facts and circumstances within the officer's knowledge'" are "'sufficient to warrant a prudent person . . . in believing . . . that the suspect has committed, is committing or is about to commit an offense.'" *Id.* at 362 (quoting *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003)). We must assess the existence of probable cause "'from the perspective of a reasonable officer . . . rather than with the 20/20 vision of hindsight.'" *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (quoting *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001)).

"It has been long settled that the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause." *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006) (internal citations and quotation marks omitted). And "[a]n eyewitness identification will constitute sufficient probable cause unless . . . there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (internal quotation marks omitted). An exception to this rule applies when the indictment was obtained wrongfully by police officers who knowingly presented false testimony to the grand jury or who testify with a reckless disregard for the truth. *Robertson*, 753 F.3d at 616 (quoting *Mott*, 524 F. App'x at 187); *cf. Sykes*, 625 F.3d at 305.

Ballard and France were arrested and prosecuted via warrants secured by grand jury indictments. Those indictments were based, in large part, on testimony and eyewitness identifications from Special Agent Lucas. Because probable cause "was established on the basis of a grand jury indictment, [plaintiffs] b[ear] the burden of producing evidence demonstrating that the remaining [defendants] either knew or were reckless in not knowing that Lucas gave false testimony that tainted the finding of probable cause." *Robertson*, 753 F.3d at 619.

### a. Ballard's Malicious Prosecution Claims

Special Agent Lucas independently identified Ballard as the man who sold drugs to Bray in his grand jury testimony and at Ballard's trial. None of the RCSO officers identified Ballard or testified before the grand jury. Lucas's identification thus provides probable cause—and the defendants are entitled to summary judgment—unless there is evidence that a reasonable officer in each defendant's position would have known there was no probable cause to prosecute Ballard.[4] *See Robertson*, 753 F.3d at 619; *Ahlers*, 188 F.3d at 370.

### i. Ballard's Malicious Prosecution Claim Against Metcalf

Ballard presents little evidence that Metcalf participated in his prosecution. There is no evidence Metcalf identified Ballard, and he did not testify before the grand jury or at Ballard's trial. Ballard argues that Metcalf watched the video of the controlled buy, knew what Ballard looked like, and therefore could have corrected Lucas's identification of Ballard. But there is no evidence in the record, aside from Bray's stricken affidavit, that Metcalf reviewed the video.

Metcalf did, however, conduct audio surveillance of the buy. Ballard points out that Transou, acting as his stand-in, needed help finding the location for the drug buy at Eastgate Apartments. Ballard asserts that he lived within two miles of Eastgate and would not have needed directions. He also asserts that Transou, pretending to be Ballard, referred to Ballard in the third person. We fail to see how a reasonable officer would know that Transou was not Ballard because he needed directions to an apartment complex. And even assuming a reasonable officer would have noticed Transou's passing mention of "West" (for "Lowestco" Ballard), that would not be enough to make a reasonable officer doubt Special Agent Lucas's eyewitness identification of Ballard as the drug dealer.

Finally, Ballard argues that Metcalf made the phone calls to Transou with Bray and must have realized Bray was not calling the number listed in the official report. At his criminal trial, Lucas testified that he and Metcalf would "look at the phone, or the informant would give him

---

[4]While the dissent would leave the question of whether a reasonable officer would believe there was probable cause to the factfinder, the Supreme Court has "reject[ed] the argument that the question of objective reasonableness is a 'question of fact best reserved for a jury.'" *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)).

the number, they dial the number, or the informant would dial the number, and he was supposed to show you the phone, what number he dialed." App'x at 2293, Lucas Testimony at Lucas Trial, R. 120. Yet Lucas wrote the DEA report that contains the wrong number. And while we could reasonably infer that Metcalf knew Bray was calling a different number, we cannot make the inferential leap to conclude that a reasonable officer would have known Bray was not calling Ballard.[5] There is also no evidence that the prosecutor relied on the phone number to prosecute Ballard. Accordingly, because Metcalf did not actively participate in Ballard's prosecution and a reasonable officer would have believed that there was probable cause, we affirm summary judgment to Metcalf on Ballard's malicious prosecution claim.

### ii.    Ballard's Malicious Prosecution Claim Against Mayer

Ballard also offers little evidence that Mayer participated in his prosecution. Mayer provided video surveillance of the buy, but did not identify Ballard and did not testify before the grand jury or at trial. Ballard points out that Mayer was following Bray on September 7, when a state trooper stopped Transou in a green Ford Bronco, and argues that Mayer should have known that Transou was not Ballard when he arrived at the September 9 buy in the same car.

But there is no evidence that Mayer saw Transou during the previous incident. Lucas's DEA report from the earlier incident did note that Transou had been driving a green Bronco on September 7, but it did not include a description of Transou and it does not suggest that Mayer saw Transou. Lucas testified at Ballard's trial that on September 9 "Ballard" (Transou) was the third different person law enforcement had seen driving the Bronco, which explains why the September 7 incident raised little suspicion. Once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence that might exculpate the accused. *Ahlers*, 188 F.3d at 371. Thus, because Ballard presented no evidence that a reasonable officer would have doubted Lucas's identification and the indictment as establishing probable cause, we affirm summary judgment to Mayer on Bray's malicious prosecution claim.

---

[5]The defendants asserted at oral argument that the targets of Operation Turnaround were using burner phones.

### iii. Ballard's Malicious Prosecution Claim Against Faith

Ballard did not argue that Faith was involved in his prosecution in the district court, and he makes only a barebones argument here. We therefore affirm summary judgment to Faith.

### b. France's Malicious Prosecution Claims

Special Agent Lucas also identified France, testifying before a grand jury and at trial that she was the woman who sold him drugs. None of the RCSO officers identified France. They were thus entitled to rely on Lucas's identification and the ensuing indictment for probable cause unless there is evidence that a reasonable officer in each defendant's position would have known there was no probable cause. *See Robertson*, 753 F.3d at 619; *Ahlers*, 188 F.3d at 370.

### i. France's Malicious Prosecution Claim Against Metcalf

Despite Metcalf's involvement in the investigation that led to France's arrest, France has not provided evidence that a reasonable officer would have known there was no probable cause for her prosecution. Metcalf provided audio surveillance and security in the field. He also identified Price, and Lucas's DEA report and Captain Faith's search warrant affidavit falsely stated that Metcalf and Faith followed Price from his home as he went to meet Bray during the October 25 buy. France points to this evidence and relies heavily on our previous decision in *Webb*, where we held that Metcalf was not entitled to summary judgment on Price's malicious prosecution claim. 789 F.3d at 670. According to France, because there was a question of fact for Price, there must also be a question of fact for her.

Despite this case arising from the same facts, *Webb* does not control our decision because Price's malicious prosecution claim is distinct from France's. We denied summary judgment to Metcalf in *Webb* because Lucas testified that he relied on Metcalf's identification of Price. This "establishe[d] a genuine issue of material fact as to whether Metcalf . . . influenced Lucas's grand-jury testimony and thereby aided in the decision to prosecute Price." *Id.* at 666. Here, Metcalf never identified France, and his actions had no impact on Lucas's grand jury testimony.

Moreover, *Webb* did not include an individualized inquiry into whether a reasonable officer in Metcalf's position would have believed there was probable cause. *Id.* at 666. Metcalf

saw an African-American woman enter the vehicle for the drug buy, but could not identify her. Lucas, who was in the vehicle, identified the woman as Geneva France and testified before the grand jury and at trial that she sold him drugs. That identification and the indictment was enough for probable cause. The evidence cited here and in *Webb* casts doubt only on the probable cause to prosecute *Price*. Thus, because France has not shown that "her *own* rights were violated, and that the violation was committed *personally* by the defendant," *Robertson*, 753 F.3d at 615, we affirm summary judgment to Metcalf.

### ii.    France's Malicious Prosecution Claim Against Mayer

France has provided no evidence that Mayer participated in her investigation or prosecution. We therefore affirm summary judgment to Mayer.

### iii.    France's Malicious Prosecution Claim Against Faith

France's malicious prosecution claim against Captain Faith mirrors her claim against Detective Metcalf. Faith was in the same vehicle as Metcalf and provided audio and video surveillance during the controlled buy. Three differences make France's claim against Faith weaker than her claim against Metcalf: Faith did not take part in Bray's initial phone calls, Faith played no role in identifying France, and Faith did not testify at France's trial. France argues that a fourth difference is dispositive: Faith admitted that his affidavit in support of a search warrant for Price's home falsely stated that he and Metcalf saw Price leave his home and followed him as he went to meet Bray during the controlled buy. The government used the search warrant to secure a guilty plea from Price after they searched his home and seized guns and drugs on October 26. *See Webb*, 789 F.3d at 656. But France was charged and convicted only for the October 25 buy, so the affidavit and search of Price's home had no impact on her prosecution. As Faith was not a participant in France's prosecution and had no reason to doubt the existence of probable cause, we affirm summary judgment in his favor.

### 3.    Fabrication of Evidence

An officer violates a person's constitutional rights when he knowingly fabricates evidence against them and a reasonable likelihood exists that the false evidence would have

affected the jury's decision. *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006). A plaintiff does not need to show that the government lacked probable cause to prevail on a fabrication of evidence claim. *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997).

### a.    Ballard's Fabrication of Evidence Claims

#### i.    Ballard's Fabrication of Evidence Claim Against Metcalf

Ballard's fabrication of evidence claim against Metcalf follows his malicious prosecution claim. Metcalf's only real involvement was being with Bray when he placed the initial phone calls to Transou. The DEA report listed the wrong number for Ballard, a number Bray never dialed. Although Lucas wrote the report, we could infer that Metcalf knew Bray was calling a different number. Even then, there is no evidence that the number played a meaningful part in Ballard's prosecution, and the discrepancy between numbers was not "reasonably likely to affect the jury's decision" in light of the fact that Lucas identified Ballard. *See Webb*, 789 F.3d at 670 (citing *Gregory*, 444 F.3d at 737). As such, Metcalf is entitled to summary judgment.

#### ii.    Ballard's Fabrication of Evidence Claim Against Mayer

Ballard has failed to provide any evidence showing that Mayer fabricated evidence against him. While Mayer recorded the buy that led to Ballard's arrest, Ballard does not claim that the video was fabricated or altered. *Cf. Webb*, 789 F.3d at 668–69 (denying summary judgment because there was a question of fact as to whether officers tampered with the audio recording of the controlled buy). He is therefore entitled to summary judgment.

#### iii.    Ballard's Fabrication of Evidence Claim Against Faith

Ballard makes no argument that Faith fabricated evidence against him, so we affirm summary judgment in Faith's favor. *See Robertson*, 753 F.3d at 615.

### b.    France's Fabrication of Evidence Claims

#### i.    France's Fabrication of Evidence Claim Against Metcalf

France's fabrication of evidence claim against Metcalf fails for the same reason her malicious prosecution claim fails: she has not provided evidence that Metcalf fabricated evidence

*against her*, as opposed to Price. France points out that the panel in *Webb* held that there was a question of fact on Price's fabrication of evidence claim against Metcalf, but *Webb*'s holding was based on the false statement that Metcalf and Faith followed *Price*. *Webb*, 789 F.3d at 670. As before, we could draw an inference in France's favor from Price's claim in *Webb*. But the false statement that Metcalf and Faith followed Price during the controlled buy would not have been "reasonably likely to affect the jury's decision" at France's trial. *Id.* (citing *Gregory*, 444 F.3d at 737). Special Agent Lucas, after all, identified France at trial and testified that he personally bought drugs from her. We thus affirm summary judgment to Metcalf on this claim.

### ii.      France's Fabrication of Evidence Claim Against Mayer

We affirm summary judgment to Mayer on France's fabrication of evidence claim because Mayer's only action in France's prosecution was to provide Metcalf an accurate, if outdated, photo of France. While we disapprove of the officers' use of a single photo labeled with a suspect's name to identify France—particularly a *sixth grade* photo from years before— the evidence was not fabricated and cannot serve as the basis for a fabrication of evidence claim.

### iii.      France's Fabrication of Evidence Claim Against Faith

We affirm summary judgment to Faith on France's fabrication of evidence claim for the reasons provided on her claim against Metcalf. While Faith admitted that he made a false statement in his search warrant affidavit against Price, there is no evidence that he fabricated evidence against France. *See Webb*, 789 F.3d at 670 (citing *Gregory*, 444 F.3d at 737).

### 4.      France's *Brady* Claim

France also appeals the district court's decision to grant summary judgment to the individual defendants on her *Brady* claims. 373 U.S. 83. *Brady* requires prosecutors and police to turn favorable evidence over to the accused when it is material to either guilt or punishment. *Id.* at 87; *Moldowan v. City of Warren*, 578 F.3d 351, 381 (6th Cir. 2009). Evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995). A "reasonable probability" is "a probability sufficient to undermine confidence in the

outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The *Brady* rule extends to evidence that is favorable "either because it is exculpatory, or because it is impeaching." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

France claims the defendants failed to disclose, among other things, that Bray was stealing drugs and money; that Bray was using his own drugs in deals; that Bray was using stand-ins; and that Bray was staging phone calls. We have already addressed Bray's use of stand-ins. Beyond that, evidence of Bray's misdeeds would have been useful only to impeach Bray. In light of Lucas's testimony—an eyewitness identification by an experienced DEA agent that France was the woman who sold him drugs—there is little chance the alleged *Brady* material would have changed the outcome of France's trial. *See Bagley*, 473 U.S. at 678. We therefore affirm summary judgment to the defendants on France's *Brady* claims.

### 5. *Monell* Claims Against Richland County

Last, Ballard and France appeal the decision to grant summary judgment to Richland County on their *Monell* claims. Richland County cannot be liable under *Monell* without an underlying constitutional violation. *Robertson*, 753 F.3d at 622 (citing *Scott v. Clay Cty., Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000)). Because no constitutional violations occurred, we affirm.

### C. Motions for Additional Discovery

Ballard and France, in their briefing and at oral argument, assert that they were unable to present more evidence showing a genuine issue of material fact because the district court did not allow adequate discovery. "The scope of discovery is within the sound discretion of the trial court, and a ruling by the trial court limiting or denying discovery will not be cause for reversal unless an abuse of discretion is shown." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 451 (6th Cir. 2008) (citation and internal quotation marks omitted). The plaintiffs' primary complaint is that they were unable to depose the individual defendants prior to the district court's first decision granting summary judgment to Mayer, Faith, Sheldon, and Metcalf in part.

In plaintiffs' first opposition to the individual defendants' motions for summary judgment, filed October 15, 2008, the plaintiffs requested "limited discovery." The district court

allowed the plaintiffs to take the deposition of the Mansfield Police Chief, but denied all other discovery.  The district court then stayed proceedings on February 9, 2009, pending the Department of Justice's investigation into Operation Turnaround.  On August 3, 2009, almost ten months after their opposition to summary judgment and first request for additional discovery, the plaintiffs moved for additional discovery again and requested—apparently for the first time—to depose Metcalf, Mayer, and Faith.  On December 7, 2010, the plaintiffs requested additional discovery yet again.  While the district court's stay of discovery remained in place, the plaintiffs were permitted to supplement the record with the documents and transcripts from Lucas's criminal trial.  These documents included the DEA and RCSO files on Operation Turnaround, as well as the testimony of Bray, Metcalf, Mayer, and Faith at Lucas's trial.

The district court then issued its first decision, granting summary judgment to Mayer, Faith, and Sheldon, but denying summary judgment in part to Metcalf.  Following that decision, the plaintiffs were allowed to conduct limited additional discovery in support of their claims against Metcalf and Richland County, and they took the depositions of Faith and several other RCSO officers.  They did not, however, take the depositions of Detective Metcalf, Sergeant Mayer, or Sheriff Sheldon, and the district court went on to grant summary judgment to Metcalf and Richland County.

Ballard and Frances's argument that the district court abused its discretion is unpersuasive on this record.  While the plaintiffs were unable to depose the individual defendants, they did not even *request* to depose Metcalf, Mayer, or Faith until their *second* request for additional discovery—almost a year after filing their opposition to summary judgment and their first detailed request for discovery.  By the time the plaintiffs asked to depose the individual defendants, the vast majority of the information they could hope to gain was available from the officers' testimony at Lucas's criminal trial.  Then, even after they were permitted to take depositions—and before the district court granted summary judgment to Metcalf and Richland County—the plaintiffs *still* chose not to depose Metcalf, Mayer, or Sheldon.  They have provided no explanation for doing so.  Accordingly, we hold the district court did not abuse its discretion in denying additional discovery.

**D.      Motion to Supplement the Record with Expert Testimony**

Finally, Ballard and France appeal the district court's decision to deny their motion to supplement the record with a declaration from James W. Wheadon prior to the court's first summary judgment decision.  The plaintiffs sought to add the declaration of Wheadon, a purported expert witness experienced in working with confidential informants, to "show[] that reasonable, trained, supervisors and officers who followed the generally accepted procedures in using confidential informants, could not help but be aware of the sort of misconduct that is alleged to have occurred during 'Operation Turnaround.'"  R. 145, Motion to Suppl. Record at 3–4, PID 5618–19.

The district court denied the motion for two reasons.  First, plaintiffs submitted the expert testimony "months after the summary judgment deadline with no good cause demonstrated for [their] tardiness."  R. 151, Dist. Ct. Op. at 43, PID 5719.  Second, Wheadon's declaration was "irrelevant in that it attempts to offer opinion evidence on what is a matter of law for the court to decide—whether qualified immunity applies, or must be denied because Defendants' conduct violated some clearly-established constitutional or federal statutory right."  *Id.*

We agree with the district court's reasoning.  Ballard and France have provided no explanation for offering this testimony so long after the summary judgment deadline.  And, "[a]lthough expert testimony may be more inferential than that of fact witnesses, in order to defeat a motion for summary judgment an expert opinion must be more than a conclusory assertion about ultimately legal issues."  *Williams v. Ford Motor Co.*, 187 F.3d 533, 543 (6th Cir. 1999) (citation and internal quotation marks omitted).  Wheadon's declaration consists of his opinion on how a "reasonable" or "reasonably trained" officer would have acted in the individual defendants' positions.  We hold the district court did not abuse its discretion in denying the motion to supplement the record with that declaration.

### III.  Conclusion

Operation Turnaround was an embarrassment and a stain on the Richland County Sheriff's Office, the DEA, and law enforcement in general.  Lowestco Ballard and Geneva France should never have been forced to spend months in prison for crimes they did not commit.

Yet in a suit under 42 U.S.C. § 1983, plaintiffs must provide evidence that each individual defendant personally violated their rights.  The plaintiffs have not provided that evidence with respect to Metcalf, Mayer, Faith, or Sheldon, and so those officers and Richland County cannot be liable under § 1983.  Accordingly, and for the reasons set forth above, we **AFFIRM**.

---

### CONCURRING IN PART AND DISSENTING IN PART

---

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part. I agree that summary judgment was properly granted in favor of Richland County Sheriff J. Steven Sheldon, Maj. Op. at 15, and that Plaintiffs' fabrication-of-evidence claims against the remaining individual Defendants were properly dismissed, Maj. Op. at 20-22. I also agree that France's *Brady* claim was properly dismissed because, given DEA Special Agent Lucas's identification of France at her trial and that the jury heard that Bray became an informant after being imprisoned for a felony conviction (manslaughter),[1] there is no reasonable probability that the outcome of France's trial would have differed had the challenged evidence been disclosed to the defense, Maj. Op. at 22-23. And, I too conclude that the district court did not abuse its discretion by denying additional discovery given Plaintiffs' counsel's strategic decision, unexplained on this record, not to depose Defendants Metcalf, Mayer, and Sheldon, Maj. Op. at 23-24, and further, that the district court did not abuse its discretion by denying Plaintiffs' belated motion to supplement the summary judgment record with an expert opinion. *See* Maj. Op. at 25.

However, I disagree with the majority regarding Ballard's malicious prosecution claims against Richland County Detective Charles Metcalf, Sergeant Matthew Mayer, and Captain Larry Faith, and France's malicious prosecution claims against Metcalf and Faith. With or without Bray's 2012 declaration,[2] Plaintiffs presented evidence sufficient to survive summary

---

[1]At France's trial, Metcalf testified that Bray was a convicted felon and had served a long prison sentence for manslaughter. PID 1834.

[2]As we observed in another "Operation Turnaround" case, *Webb v. United States*, 789 F.3d 647 (6th Cir. 2015):

> Bray's 2007 statements to OIG investigators that Lucas was a knowing participant in the scheme to frame Webb establishes a genuine issue of material fact as to whether Lucas lied in his grand-jury testimony. Bray told investigators that he used a DEA-provided device to record a face-to-face conversation with Webb on the day before the drug buy targeting Webb, but Webb made no incriminating statements. Bray told Lucas that he would be unable to get Webb to sell drugs at a controlled buy, but Lucas instructed him to "do what he had to do." That night, Bray paid Conrad $200 to act as a stand-in for Webb for the following day.
>
> **In his first five interviews with federal investigators, Bray repeated his claim that Lucas was an active participant in the stand-in scheme against Webb.** However, Bray later

judgment. I would also reverse the grant of summary judgment to Richland County on Plaintiffs' related *Monell* claims.

**I.**

Operation Turnaround began in late 2004. The RCSO signed Jerrell Bray as a confidential informant (CI) in January 2005. Beyond that point, I part with the majority's depiction of the facts in certain respects. Viewing the facts in the light most favorable to Plaintiffs, as we must, Plaintiffs presented evidence that the RCSO, not the DEA, determined who would be targeted in Operation Turnaound. App'x 09-cr-222 Metcalf Testimony at 1700-01; Faith Testimony at 2218-19; Lucas Testimony 2293-94. It is undisputed that Bray was working as a CI for the RCSO to avoid prosecution for an incident involving stolen property in Richland County discovered by Detective Metcalf. And it was RCSO officers, including Metcalf, Mayer, and Faith, who knew by sight Operation Turnaround targets including Lowestco Ballard and Ronald Davis, the person who purportedly sent Geneva France to deliver crack to Bray. PID 1810-11/Metcalf testimony at France trial. The majority presents one view of the evidence, that is, that the DEA took control of Operation Turnaround and that DEA Agent Lucas's testimony and identifications of France and Ballard foreclose their malicious prosecution claims. But Lucas testified that he did not know the Mansfield area or any of the targets the RCSO had selected; he came in from Cleveland to assist in the RCSO investigation.

Unmentioned in Defendants' appellate briefs and the majority opinion is that as early as February 10, 2005, ***months before DEA Special Agent Lee Lucas joined Operation Turnaround in August 2005***, Detective Metcalf and his supervisor, Sergeant Mayer, were allowing CI Bray to turn recording equipment on and off during alleged drug buys and did not

---

recanted these allegations at Lucas's criminal trial in 2010, where he testified that he acted alone to frame Operation Turnaround targets and lied about Lucas's participation in the Webb drug buy.

The Defendants argue that we should not credit Bray's initial allegations because he recanted them at Lucas's criminal trial. But it is commonplace for individuals to make contradictory statements. When this occurs, we permit litigants to use inconsistencies to impeach or discredit those statements **and leave it to a fact-finder to determine whether one statement is more truthful than the other . . . . It is for the jury to determine whether Bray was telling the truth in his first five interviews with federal investigators, Lucas's criminal trial, or neither.**

*Webb*, 789 F.3d at 660 (emphasis added).

know where Bray was during an alleged drug transaction; and Captain Faith was aware of these improprieties. *See* Plaintiffs' Sealed Appendix at 41/Brown Rpt. Detective Brown's notes, which were before the district court in the instant case, PID 7648/Pls. Response to Metcalf's Mo. for Summ. J. filed 10/4/12, were discussed in *Mott v. Mayer*, 524 F. App'x 179 (6th Cir. 2013), another "Operation Turnaround" case:

> We describe a few of the events referenced by the district court in order to illustrate the conduct of Bray and the investigators during "Operation Turnaround."
>
> On February 10, 2005, Metcalf asked Detective Dawn Brown, a detective with METRICH [**3**], a multi-county drug task force, to assist with a controlled buy that Bray was to make that day. Brown expressed concern that Bray, who was on parole after serving a prison sentence for involuntary manslaughter, was acting as a confidential operative without the consent of his parole officer. Bray nevertheless completed the buy. Brown's notes express several concerns about the way that the buy was conducted. Mayer and Metcalf did not know where Bray was during the transaction, and they did not follow Bray after the buy, even though they were responsible for monitoring him in order to ensure both the safety of the parties involved and the integrity of the evidence.[**4**]

---

[**3**]Dawn Brown was an RCSO detective. Faith Dep. at 81-82; Brown Report at 48.

[**4**]*Mott* further recounts Metcalf's and Mayer's misconduct and their acquiescence in Bray's misconduct:

> About a month later, Bray claimed that he purchased crack cocaine and a gun from Tyron Brown and Jason Westerfield in a controlled buy on March 12, 2005, and that he bought crack cocaine from Westerfield in a controlled buy on March 15, 2005. Mayer and Metcalf conducted surveillance on the March 15 transaction. In Mayer's report, he noted that Metcalf, who was familiar with Westerfield and knew what he looked like, "could see a visual on [Bray] and Jason Westerfield." Metcalf later testified that he saw Bray go into a house and saw Westerfield's car pull up to the house, but he did not know whether the man who got out of the car was Westerfield. **Both Mayer and Metcalf knew that Westerfield was wearing a GPS issued by the Adult Parole Authority, and Mayer's report noted that they should check the GPS records to confirm his whereabouts at the time of the alleged drug sale. Mott argues that there is no evidence that Mayer and Metcalf checked the GPS records, and Mayer and Metcalf do not dispute this. The GPS records would have revealed that Westerfield was not present at the location of either the March 12 or the March 15 buy.**
>
> On March 31, 2005, Bray's girlfriend told the RCSO that Bray had crack cocaine, which the RCSO had not authorized him to have, hidden in the steering wheel of his car. This violated Bray's Confidential Operative Agreement with the RCSO. He was arrested and charged with drug abuse and possession of drugs. **Bray told Metcalf about the incident, offering conflicting explanations for the drugs, and asked Metcalf to help resolve the issue. The case was dismissed**.
> . . . .
> On November 8, 2005, Lucas testified before a grand jury regarding "Operation Turnaround." He described Mott as "one of the larger drug dealers" from Detroit. Lucas testified

*Mott*, 524 F. App'x at 180.

Ballard and France were indicted on November 9, 2005,[5] the latter for a drug deal alleged to have occurred on October 25, 2005. France was convicted on false evidence, sentenced to ten years' imprisonment, and spent sixteen months in prison. Ballard spent ten months in pretrial detention and was acquitted.

## II.

## Bray pleads guilty, admitting to framing France, Nabors, Ward and Parker

France, Ballard, Dwayne Nabors, Joe Ward II, and Johnnie Parker instituted this action in December 2007, asserting claims of malicious prosecution and fabrication of evidence against

---

that Bray purchased 27.6 grams of cocaine from Mott on September 6, 2005. He also testified that investigators followed Mott and two other men in a Bronco on September 8. Finally, Lucas said that Bray bought 50.8 grams of crack cocaine from Mott on September 15, 2005.

The grand jury issued an indictment on November 9, 2005. . . . Mott was arrested . . . [and] . . . . explicitly denied selling Bray crack cocaine on September 6, 2005, and September 15, 2005. He admitted to being present at the 435 Tremont Avenue residence on September 6 when Bray was there but stated that both he and Bray purchased crack cocaine from Williams . . .

Mott pled guilty to Count One of the superseding indictment on May 24, 2006. The charges regarding the alleged drug buys on September 6 and September 15 were dismissed. Mott also pled guilty on August 29, 2006, to distributing cocaine base while he was out on bail.

. . . .

The district court concluded that the grand jury's indictment did not establish probable cause for Mott's arrest because it was based on false testimony by Lucas. The district court observed that Lucas's testimony was based entirely upon unreliable, uncorroborated information from Bray and that several of Lucas's statements were misleading or false. Nonetheless, the district court held that there was probable cause to prosecute Mott based on his post-arrest statement to investigators that he was involved in drug trafficking. Therefore, the district court concluded that Mott did not meet his burden of producing evidence that his constitutional right was violated and that the defendants are entitled to qualified immunity as to Mott's malicious prosecution claim.

. . . .

We may reverse a district court's grant of qualified immunity to defendants on interlocutory appeal where fundamental factual disputes preclude summary judgment . . . . The district court improperly granted summary judgment to the defendants on the ground that Mott could not meet the second element of his claim [i.e., that there was a lack of probable cause for the criminal prosecution], and, therefore, we reverse . . . . We remand to the district court so that it may consider whether Mott demonstrates a genuine issue of material fact as to all the elements of his claim, thereby precluding a grant of qualified immunity to the defendants.

*Mott*, 524 F. App'x at 181–83 (emphasis added).

[5]The plaintiff in *Mott* was arrested on November 10, 2005, the same day as France.

RCSO officers Metcalf, Mayer, Faith, and Sheldon; RCSO's paid CI, Jerrell Bray; DEA Special Agent Lee Lucas;[6] the United States and various DEA employees, various other individuals, and *Monell* liability against Richland County. Shortly after, CI Bray, who claimed to have made controlled buys from fifteen individuals between September 6 and October 25, 2005, pleaded guilty to two counts of perjury and five counts of deprivation of civil rights, admitting to framing France and Nabors by using stand-ins at staged transactions, and to framing Ward and Parker by claiming that he had purchased drugs from them that were already in his possession.[7]

> The Assistant United States Attorney stated at Bray's December 20, 2007 plea hearing:
>
> The five separate counts of deprivation of civil rights–in order to violate that statute, it would have to be established beyond a reasonable doubt that Mr. Bray, **while acting under color of state law**, willfully deprived [the individuals of their] rights to be free from unreasonable seizure and the Fifth Amendment right to not be deprived of liberty without due process of law.
>
> [As to Geneva France:] Count 5 alleges that on October 25, 2005, again, there was an individual targeted as being a trafficker of cocaine. A deal was set up with purportedly a female who was to deliver the two and-a-half ounces of crack cocaine to Mr. Bray and to a law enforcement officer on behalf of this targeted drug dealer.
>
> Again, a confederate [of Bray] was enlisted to show up. Neither the targeted drug dealer [sic] had actually been involved in the case, and the confederate had posed as that person, and the woman [confederate] did show up bringing Mr. Bray's crack cocaine, which was turned over to Mr. Bray and law enforcement.
>
> Mr. Bray knowingly, not immediately, but shortly thereafter came up with an identification, a person that has been identified in the information as G[eneva] F[rance]. GF was falsely identified as being the person that brought the crack cocaine on that day.
>
> That individual GF was indicted, arrested, tried, convicted and sentenced to ten years . . . . So those are the five civil rights cases [in four of them] he basically .... provided false identification of persons being drug traffickers. . .
>
> . . . .

---

[6]DEA Special Agent Lucas was assigned to the Cleveland Resident Office from around 2000 to 2008. USA001-023379/Sealed Appendix vol. I, filed in *Webb v. United States*.

[7]Bray's guilty plea did not implicate the charges brought against Ballard.

> **As far as the two perjury counts** . . . each alleges that in two separate trials here in Federal District Court in Cleveland, Count 6 alleges that on February 14[th], 2006, Mr. Bray was **testifying in the trial of G[eneva] F[rance]** . . . and it is alleged that Mr. Bray testified that GF was the person in the car delivering the crack cocaine . . . [Bray] identified the Defendant in Court as being that person when he knew that GF had not been present at the drug deal . . . .

PID 1016-19 (emphasis added).

As we recounted in another Operation Turnaround case, *Webb v. United States*, 789 F.3d 647, 652–53 (6th Cir. 2015):

> Following the completion of Operation Turnaround, Bray . . . disclosed that Lucas conspired with him to frame innocent individuals . . .
>
> This admission prompted the Office of Inspector General (OIG) of the United States Department of Justice to launch an investigation, which revealed that numerous Operation Turnaround targets . . . did not participate in the drug deals for which they were charged. Bray had used stand-ins to participate in the drug deals and then falsely identified each stand-in as an Operation Turnaround target. *Robertson*, 753 F.3d at 612. Bray later testified that Lucas did not conspire with him to frame targets and that he acted on his own initiative. **In any event, the OIG concluded that law-enforcement officials supported Bray's false identifications by knowingly making false reports and testimony and by covering up his misdeeds.**
> . . . .
> The United States charged Lucas with making false statements, violation of civil rights, obstruction of justice, and perjury. The jury found Lucas not guilty. Despite the verdict, a 2011 OIG investigation concluded that Lucas falsified reports and testimony to corroborate Bray's false identifications.

*Webb*, 789 F.3d at 652–53 (emphasis added).

### III.

Plaintiffs filed their amended complaint on April 18, 2008.[8] PID 6101. In late May and June 2008, DEA Agent Lucas and RCSO Officers Metcalf, Mayer, Faith, and Sheldon separately moved for summary judgment on qualified immunity grounds. R. 50-53, 57. Plaintiffs

---

[8]Plaintiffs' first amended complaint alleged additional claims that are not at issue in this appeal. PID 215-220/First Am. Comp. filed 4/18/08.

responded with an omnibus memorandum opposing Defendants' motions.   PID 1599/filed 10/15/08.

**RCSO Detective Metcalf Pleads Guilty of Falsely Identifying Nabors at Trial as a Participant in a Drug Deal**

CI Bray was not the only Defendant to plead guilty while this matter was before the district court.   In May 2009, RCSO Detective Metcalf, CI Bray's supervisor throughout Operation Turnaround,[9] notified the district court that a criminal bill of information had been filed against him; that he had pleaded guilty on May 14, 2009 to one count of violation of civil rights, 18 U.S.C. § 242, i.e., presenting false evidence against Nabors at trial regarding **a** controlled purchase on September 20, 2005, and falsely identifying Nabors as a participant in a drug deal; and that his sentencing was scheduled for November 5, 2009.

The Information to which Metcalf pleaded guilty states in pertinent part:

3.   On September 20, 2005 . . . METCALF assisted DEA in conducting a controlled purchase of cocaine and cocaine base from a group of individuals, purportedly including Dwayne Nabors.  [METCALF's] principal function was to provide physical surveillance and back-up security for a series of meetings relating to the purchase of the controlled substances.

4.   One of the aforementioned meetings was conducted in the parking area of a business establishment owned and operated by Dwayne Nabors.

5.   On November 10, 2005, Dwayne Nabors was charged in a federal indictment with conspiring to distribute and distributing cocaine and cocaine base . . . stemming from the controlled purchase on September 20, 2005.  Dwayne Nabors was subsequently arrested and detained pending trial for these charges and one additional charge.

6.   The trial . . . was held . . . between July 10 and July 24, 2006.  The jury acquitted Dwayne Nabors on the charge of conspiracy to distribute and hung on the charge of distribution.  [METCALF] appeared as a witness for the prosecution at the trial.

---

[9]France App'x 1235-37.

7. Dwayne Nabors was not present at the meeting referenced in Paragraph 4, above, nor did he participate in any manner in the drug transaction which occurred on September 20, 2005.

. . . .

On July 14, 2006, . . . METCALF, while acting under the color of law, did willfully deprive Dwayne Nabors of the right to due process of law and to not have false evidence knowingly presented against him, as is guaranteed by the Fifth Amendment to the Constitution and the Laws of the United States, in that, while testifying as a detective for the Richland County Sheriff's Office and on behalf of the United States of America, . . . METCALF [] declared that the meeting referenced in Paragraph 4, above, had not been videotaped, and that after said meeting he and LML [DEA Special Agent Lucas], another law enforcement officer, positioned themselves in such a manner as to allow for both officers to positively identify Dwayne Nabors as being a participant; whereas . . . METCALF [] well knew and believed that said meeting had been videotaped, and that he and LML had not positioned themselves so as to allow for an identification of Dwayne Nabors.

PID 4170-72.

After Metcalf pleaded guilty, he withdrew the affidavit he had submitted in support of his first motion for summary judgment,[10] which stated in pertinent part:

9. On September 9, 2005, a controlled buy of illegal drugs was made from Lowestco Ballard. At the time of the controlled buy, I was at the Richland County Sheriff's Office operating surveillance equipment. I did not identify Lowestco Ballard as the individual involved in the controlled buy on September 9, 2005.

. . . .

11. On September 20, 2005, a controlled buy of illegal drugs was made from Dwayne Nabors. My involvement consisted of providing security and surveillance. I did not identify Dwayne Nabors as being involved in the controlled buy on September 2005.

---

[10]On May 22, 2009, Metcalf withdrew the affidavit he had filed in support of his motion for summary judgment on qualified immunity grounds. PID 4173-74.

12. My involvement in the October 25, 2005, controlled buy from Geneva France primarily consisted of operating the surveillance equipment and providing security support. I did not identify Geneva France as being involved in the controlled buy. Jerrell Bray and DEA agent Lee Lucas independently identified Geneva France as being involved in the October 25, 2005, controlled buy.

PID 313-14/Metcalf Affid. attached as exhibit to Metcalf's Mo. for Summ. J. filed 6/30/08.

**January 2011 – The United States and all Federal Defendants Settle with Plaintiffs**

In January 2011, the United States and all federal defendants were dismissed pursuant to a comprehensive settlement with all Plaintiffs. PID 6130.

On January 4, 2012, the district court granted summary judgment in full to Mayer, Faith, and Sheldon and in part to Metcalf, denying Metcalf summary judgment as to Ballard's and Nabors's false arrest, malicious prosecution, and fabrication of evidence claims. PID 5680, 5721.

On March 27, 2012, Metcalf moved for summary judgment on Ballard's false arrest claim, PID 5858, and Richland County moved for summary judgment on Plaintiffs' *Monell* claims.[11] Bray died in prison in September 2012.

In October 2012, the district court granted Metcalf summary judgment on the merits on Ballard's claims, relying in part on Metcalf's statement in his second affidavit, dated March 22, 2012, PID 5862, that he did not view the video of the purported Bray-Ballard transaction on September 9, 2005, prior to Ballard's trial, PID 7823, and granted Richland County summary judgment on Plaintiffs' *Monell* claims, concluding that "Defendants have met their burden to show that no issue of fact remains for a jury to decide concerning Plaintiffs' *Monell* claims and the claims of Plaintiff Ballard." PID 7809. Following this ruling, other than Ballard's and France's claims against Bray[12], only Nabors' § 1983 claims against Metcalf remained. PID

---

[11]In September 2012, Nabors moved for partial summary judgment as to liability against Metcalf on his claims of false arrest, malicious prosecution, and fabrication of evidence, and against Richland County based on *Monell*. PID 7044.

[12]Subsequently, the district court entered an order on May 29, 2013, substituting the estate of Jerrell Bray for Bray. R. 212.

7812. Nabors settled those claims and a stipulated dismissal entered on April 17, 2015. PID 7939.

The district court dismissed the case on April 21, 2015. PID 7940.

**IV.**

The majority affirms the district court's determination that, without Bray's 2012 affidavit, there was no record evidence that Metcalf committed any Fourth Amendment violation against Ballard. PID 7822. I disagree. I also disagree that the district court properly granted summary judgment in Mayer and Faith's favor on Ballard's Fourth Amendment claims.

**A. Ballard's Malicious Prosecution Claims**

Malicious prosecution "encompasses wrongful investigation, prosecution, conviction, and incarceration." *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (quoting *Barnes v. Wright*, 449 F.3d 709, 715–16 (6th Cir. 2006)). Plaintiffs presented evidence from which a fact finder could conclude that Mayer, Metcalf, and Faith influenced the decision to prosecute Ballard and that the prosecution lacked probable cause. *See Sykes*, 625 F.3d at 308.

METRICH Project Director Dino Sgambellone testified that as a result of Detective Dawn Brown's report and various other reports of improprieties, METRICH deemed Bray unreliable as a CI and "deactivated" him; Richland County, however, continued using Bray. DEA Agent Lucas testified that even after the DEA became involved in Operation Turnaround, RCSO Detective Metcalf and Sergeant Mayer continued to control Bray most of the time. App'x 09-cr-222 Lucas testimony at 2293-94, Metcalf testimony at 1709. Agent Lucas also testified that Metcalf, Mayer, and Faith, all of whom were directly involved in monitoring drug transactions involving CI Bray, provided information that went into Lucas's reports of each transaction, France App'x 2291-96, reports that went to Assistant United States Attorney Blas Serrano, who prosecuted Plaintiffs. AUSA Serrano testified on deposition that he received reports to support the indictment of each of the Operation Turnaround targets and recalled that some were RCSO reports. *Id.* at 3184-85.

Metcalf testified that before setting up any drug buys, RCSO officers would view photographs of the targets and suspects so they would know what they looked like. France App'x at 1780-1782. Metcalf's, Mayer's, and Lucas's names appear in the official report of the September 9, 2005, transaction in which Transou was a stand-in for Ballard. Metcalf monitored and kept sound recordings of the calls setting up the purported Bray-Ballard buy and of the transaction, Mayer videotaped the transaction, and Faith monitored the cobble phone from the office. Phone records show that the phone numbers dialed, whether by Bray or Metcalf, were not Ballard's, but the official report of the September 9 transaction says nothing to that effect or that the man who purportedly was Ballard referred to himself in the third person. The audio tapes of the transaction, as the majority notes, reveal that the person who was supposedly Ballard did not know how to find a location that was within 1½ miles of Ballard's house (Ballard was a lifelong resident of Mansfield), but the official report says nothing to that effect. Also omitted from the official report is that Bray is 5'7", Ballard is 6'5" and thin, and the stand-in for Ballard, Transou, appears in the video to be around four inches taller than Bray.

A reasonable factfinder could conclude that the actions or omissions of Metcalf, Mayer, and Faith constituted either influence over or participation in the decision to prosecute Ballard even though they did not make the ultimate decision to prosecute him. *See Sykes*, 625 F.3d at 311 (concluding that "a reasonable jury could have found the Defendants liable for malicious prosecution . . . [where] there was not only a lack of probable cause to institute a criminal proceeding against the Plaintiffs, but the Defendants' actions . . . were sufficient to qualify as either 'influence [over] or participat[ion] in the decision to prosecute' regardless of the fact that the Defendants, themselves, did not make the ultimate decision' . . . . Based on the evidence . . . a reasonable jury could have concluded that Sgt. Nichols testified falsely at the preliminary hearing and that her statements were material to the state court's finding of probable cause.")[13].

---

[13]The majority relies on *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008), for the proposition that the Supreme Court has rejected that the question of objective reasonableness is one of fact best reserved for a jury. Maj. Op. at 17 n.4. However, in *Dunn*, a § 1983 excessive-force case arising from the defendant's arrest, a videotape captured the events surrounding the arrest. The defendant acknowledged that the video must control but asserted that a jury must determine from the video whether the officers used excessive force. *Id.* at 354. This court observed:

> The Supreme Court recently clarified the summary-judgment standard for excessive-
> force claims, rejecting the argument that the question of objective reasonableness is "a question

As in *Sykes*, it is for the factfinder to determine whether a reasonable officer would believe that Ballard had violated the law. *See* Maj. Op. at 15-16. I would reverse the grant of summary judgment to these Defendants on Ballard's malicious prosecution claim.

## B. France's Malicious Prosecution Claims

Plaintiffs also presented sufficient evidence to survive summary judgment regarding whether RCSO Defendants Metcalf and Faith influenced, participated, or aided in the decision to prosecute France.

**Lucas's Testimony at France's Trial**

Lucas identified France at her trial in February 2006 as the woman who sold drugs to Bray on October 25, 2005. He testified that when she got in the car, he introduced himself as "Todd" and she introduced herself as "Little S." PID 2134. Lucas testified that after the drug transaction, Metcalf showed him a photo but it was not of the woman who had sold them drugs on October 25, 2005. Two days after the drug buy, however, Metcalf showed him a photo of France, and Lucas identified her as the woman. PID 2135. Lucas testified that he was present when the same photo was later shown to Bray and Bray said "yeah, that's Geneva." PID 2136.

**Metcalf's Testimony at France's Trial**

Detective Metcalf testified at France's trial that on October 25, 2005, he was responsible for "the technical work, the recordings . . . basically kept security for our informant [Bray] and Lee Lucas," and that he helped get the controlled phone-call set-up, i.e., Bray's purported call to

---

of fact best reserved for a jury." *Scott*, 550 U.S. at __ , 127 S. Ct. at 1776 n.8 (quoting *Scott*, 550 U.S. at __, 127 S. Ct. at 1784 (Stevens, J., dissenting)). "At the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record* . . . the reasonableness of [the defendant's] actions . . . is a pure question of law." *Id.* . . .

. . . .

Considering the *Graham* factors, from the Officers' perspectives on the scene and not using hindsight, we conclude that the video shows that the Officers acted reasonably in attempting to neutralize a perceived threat by physically removing Dunn from his vehicle after he led Officer Matatall on a car chase and then appeared to refuse the Officers' commands to exit the car.

*Matatall*, 549 F.3d at 353-54. The instant case is more analogous to *Sykes*, which was decided after *Matatall*.

Ron Davis, an alias used by Herman Price. PID 1806-07, 1810, 1840. Metcalf testified that he had done surveillance on Ron Davis before the purported Bray/Davis-France drug transaction, and that he and Captain Faith performed surveillance of the drug buy and observed Bray actually meet with Ron Davis. PID 1806, 1811. Metcalf testified that he received information from Jerrell Bray regarding the identity of the female. On cross-examination, Metcalf testified that because Bray gave him the name "Geneva," the RCSO looked for that name in the Mansfield schools photos. PID 1849. Metcalf also testified that he came across Geneva France's name after getting police department records of the calls made at 154 Arthur, Geneva France's address. PID 1850. The photo the RCSO showed to Bray and Lucas is a sixth-grade photograph of France. France App'x 3196. France was twenty-three years old when she was tried for selling drugs to Bray and Lucas.

**Testimony at Lucas's Trial in 2010**

Bray testified at Lucas's trial that he did not call Ron Davis to set up the drug transaction, instead he called Karmiya Moxley, a friend of Bray's girlfriend Alexis Young. The second call Bray made was not to Ron Davis either. App'x 09-cr-222 Bray Testimony 1158-62, 1168-69. Bray testified that Geneva France was not the woman involved in the drug transaction on October 25, 2005; Moxley, who is known as Shea Shea and "Lil S," sold Bray crack that day. App'x 09-cr-222 Bray Testimony 1158-62, 1168; *Id.* Moxley Testimony at 1929. Unlike his testimony at France's trial, Metcalf testified at Lucas's trial that he prompted Bray to name someone as the woman involved in the transaction. France App'x/Metcalf Testimony at 1795 ("I told [Bray] we had to identify her, and he came up with a girl by the name of Geneva . . . and she lived . . . on Arthur, and I think my sergeant [Mayer] got a police report from Arthur and came up with the names, and one of the names was Geneva France.") Bray said he knew Geneva from the neighborhood. Then, the RCSO obtained the sixth-grade photo of France. *Id.* Mayer Testimony 1618-20. Metcalf showed Bray and Lucas, separately, the photo of France, and each identified France as "Lil S" from a one-photo array. France App'x /Metcalf Testimony at France Trial 220-221, 227-28. Moxley, who actually engaged in the transaction, was a brunette, while

France had dyed blonde hair. Simple observation would have alerted Metcalf that France was not present at the drug transaction.[14]

Metcalf and Faith lied about following Davis/Price from his residence on Glessner Avenue to a house on Adams Street. Maj. Op. at 5. Davis had purportedly sent France to the drug transaction with Bray that day. A reasonable factfinder could find that Metcalf and Faith knew or should have known that Ron Davis was not aware of any drug transaction on the day Bray and Lucas met "Lil S," a mule purportedly sent by Davis.[15] As the majority notes, the audio recording reveals that Bray and Davis/Price never discussed a drug purchase. Maj. Op. at 5. A reasonable factfinder could infer from Metcalf's testimony at Lucas's trial that Metcalf pressured Bray to come up with a name for the female mule. A reasonable jury could infer from Bray's testimony at Lucas's trial that Metcalf and Faith knew or should have known that "Lil S" was not France but nonetheless allowed Bray and Lucas to incorrectly identify France as a mule in the transaction.

---

[14]Metcalf testified at France's trial that he and Captain Faith performed surveillance on October 25, 2005, and observed Bray meet with Ron Davis at 187 South Adams Street. PID 1806, 1810-11. Metcalf testified that after Davis met Bray and Lucas, Metcalf continued performing surveillance and saw an African-American woman, who was not blonde, get in the vehicle with Bray and Lucas. PID 1811, 1816.

[15]After the district court granted Defendants summary judgment in the instant case in 2012, this court in *Webb* concluded that Faith and Metcalf made false statements that were used to establish or strengthen probable cause to prosecute Davis/Price:

> On October 25, 2005, Bray told law-enforcement officers that he could set up a controlled buy with an individual named "Ronald Davis." "Ronald Davis" was an alias used by Herman Price, but Bray did not learn of this until after Price had been indicted and arrested . . . .

> Also on October 25, 2005, **Metcalf** and Lucas **recorded and monitored two calls that Bray placed to set up the controlled buy.** According to Lucas's report, at 2:05 PM, Bray called a phone number associated with Price. Bray actually called his own girlfriend's cellphone and spoke with Shay Shay Moxley, a female friend of his girlfriend, to set up a controlled buy. Lucas's DEA-6 report noted that Bray spoke to a woman named "Lil S" about the drug deal. At 2:08 PM, **Metcalf** and Lucas **monitored and recorded a second call that Bray** placed to Marcus English, whom Bray identified to the officers as Price. English was in fact Price's cousin . . . .

> After these calls, Faith and Metcalf drove to Price's home on 121 Glessner Avenue. According to Lucas's DEA-6 report **and Faith's affidavit for a search warrant of the home, Faith and Metcalf identified Price, observed him departing 121 Glessner Avenue in a silver car, and followed him to 187 South Adams Street.** Faith and Metcalf would later admit that they did not see anyone depart 121 Glessner Avenue. While they saw *someone* driving a silver Caprice on Glessner Avenue, they neither identified the driver nor attempted to follow him.

*Webb*, 789 F.3d at 670 (emphasis added).

I would reverse the grant of summary judgment to Metcalf and Faith on France's malicious prosecution claims.

## V. *Monell* Claims

Richland County asserted in its motion for summary judgment that Plaintiffs cited no authority to support that there can be a viable *Monell* claim against it based on Bray's misconduct, but Richland County's own briefing below cited authority recognizing that the activities of paid government informants can be considered government action. *See Hiser v. City of Bowling Green*, 42 F.3d 382, 383 (6th Cir. 1994) (this court looks "to all the facts to determine whether a paid government informant 'may fairly be said to be a [government] actor . . . because he has acted together with **or has obtained significant aid from** [government] officials, or because his conduct is otherwise chargeable to the State.'") (quoting *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982)).  PID 5837/Richland Cnty. Summ. J. Mo.

Without considering Bray's 2012 declaration, Plaintiffs presented evidence that, with Bray's input, the RCSO, *not the DEA*, decided whom to target in Operation Turnaround, and that Metcalf and Mayer largely retained control and supervision over Bray.  A reasonable jury could conclude that Metcalf, Mayer, and Faith at the very least *acquiesced in* and, more likely, *actively supported and condoned*, Bray's framing of Ballard and that Metcalf and Faith did the same with regard to France's framing.   Plaintiffs presented evidence that violations of the law by a confidential informant had to be reported to the Sheriff.  Dale Fortney Testimony on Richland County's behalf/Dep. 2884-85, RCSO SOPs 3707.

Thus, Plaintiffs presented evidence sufficient to raise an issue of fact whether Richland County had a custom of tolerance of or acquiescence in federal rights violations, which would support the existence of an illegal municipal policy or custom.  *See Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) ("There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom.  The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision;

or (4) a custom of tolerance or acquiescence of federal rights violations.") (citing *Monell*, 436 U.S. at 694, and other cases).

I would reverse the district court's grant of summary judgment to Richland County on Ballard's and France's *Monell* claims, to Metcalf, Mayer, and Faith on Ballard's malicious prosecution claims, and to Metcalf and Faith on France's malicious prosecution claim.